UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

......................................................

TODD REGNIER,

FILED
IN CLERK'S
U.S. DIST

★ SEP 25 2014 ★

COMPLAINT

                    Plaintiff,                    Index No.

        - against -                    PLAINTIFF
                                        DEMANDS
NEW YORK COLLEGE OF OSTEOPATHIC MEDICINE     TRIAL BY JURY
OF NEW YORK INSTITUTE OF TECHNOLOGY
("NYCOM-NYIT" or "NYCOM"),

                    Defendant.            CV 14 5627
                                          WEXLER, J.
......................................................

        Plaintiff, Todd Regnier, by and through his attorneys, Kevin T. Mulhearn,

P.C., complaining of the Defendant, hereby alleges that:

                                        BROWN, M. J.

                    JURISDICTION AND VENUE

        1.     This Court has exclusive jurisdiction over this matter pursuant to 28

U.S.C. § 1331.

        2.     This Court has supplemental jurisdiction over Plaintiff's claims under

New York State law, pursuant to 28 U.S.C § 1367, in that said state claims are

inextricably intertwined with the federal claims in this action.  Indeed, the state law

claims are so related to the federal claims in this action that they form part of the

same case or controversy under Article III of the United States Constitution.

        3.     Venue is proper in the Eastern District of New York pursuant to 18

U.S.C. § 1965 (c) and 28 U.S.C. § 1391(b), because the claims arise in this District

and the Defendant resides in, transacts business in, and/or maintains a principal place of business in this District.

## PARTIES

4.    Plaintiff, Todd Regnier, is an individual residing within the State of New York.

5.    Defendant, New York College of Osteopathic Medicine of New York Institute of Technology ("NYCOM-NYIT" or "NYCOM"), is, and at all material times has been, a private Medical College located in the County of Nassau, State of New York.  Its business address is Northern Boulevard, PO Box 8000, Old Westbury, New York, 11568.  At all material times, Defendant employed various agents and employees, who acted within the scope of their agency and/or employment with the school.

## FACTS

**Todd Regnier**

NYCOM Class of 2012
Enrolled  8/2010, Expelled 7/23/2012
Reason for dismissal:  "Failure to Comply"

**Pre-NYCOM**

6.    Plaintiff was class valedictorian at Ludlow High School in 2003 in Ludlow, Massachusetts.  He attended University of Massachusetts at Amherst and spent his summers of 2004 and 2005 working on scientific research conducted at

2

the Weill Cornell Medical School. 20-year-old Plaintiff would be listed as a co-author when the findings were published in the September 18, 2008, issue of *Genesis: The Journal of Genetics and Development* as "Evolutionary conservation of vertebrate notochord genes in the ascidian *Ciona intestinalis*."

7.     During the summer of 2006, Plaintiff pursued biomedical research under a paid internship at the National Institute of Health in Maryland. Along the way, Plaintiff, who wanted to go into medicine, obtained an Emergency Medical Technician license so that he could work as an EMT volunteer. Plaintiff graduated *cum laude* in 2007 with a B.S. in microbiology and a GPA of 3.71. He took the MCATs and received a score of 32, ranking him in the top 85th percentile in the country.

**Enrollment**

8.     Plaintiff applied to NYCOM for several reasons. It was a Northeast college, within driving distance of his parents in Massachusetts. It was close to New York City. He especially liked the NYCOM/NYIT campus. Plaintiff felt comfortable with his NYCOM interviewer.

9.     In 2010, Plaintiff was accepted as a member of the NYCOM Class of 2014. He arranged to share a small private house with two other male NYCOM students. They signed a one-year lease.

3

10.    At first, in or about August 2010 through December 2010, Plaintiff flourished in medical school.  He passed a grueling rite of passage, the initial 3-month "Intro" course, famous for its high dropout rate.  Plaintiff received a grade of 86 in the Intro class.  Then Plaintiff received an A in Anatomy, a demanding class that requires extreme memorization and cadaver dissection.

**Roommates**

11.    Plaintiff did not know his roommates when he moved into the Bayville house.  As the weeks progressed, Plaintiff began to wonder if he had made a mistake.

12.    One roommate was in his mid-30s – nearly a decade older than Plaintiff.  But he quickly found that his more "mature" roommate was a hard drinker who was loud, aggressive, and sometimes bad tempered.  Plaintiff noticed that he often drank alcohol even on days when he had classes.

13.    In or about November 2010, Plaintiff mentioned this drinking to his roommate.  The roommate countered that he did not have a drinking "problem."

14.    Plaintiff's two roommates were noisy night-owls who stayed up late, slamming doors, talking loudly, watching TV with the volume on high, even doing their laundry, in the room next to Plaintiff's, while Plaintiff was sleeping or trying to sleep.

**Trouble studying**

15.    As weeks passed, Plaintiff noticed that his older roommate developed an explosive temper which surfaced when he drank beer. The roommate smashed the kitchen grill one day in a fit of rage. The roommate also joked to Plaintiff that he and a friend had once driven their car over a man they had seen lying in the street.

16.    Plaintiff did not think this was funny. Although the roommate later told Plaintiff it was not true, Plaintiff was not convinced.

17.    The older roommate started picking fights with Plaintiff, and Plaintiff grew anxious and distressed. Plaintiff could not concentrate. Plaintiff could not sleep. Plaintiff began to have trouble studying.

**First "F"**

18.    At the end of the Fall 2010-11 semester, as Winter Recess was about to begin, Plaintiff learned he had received an "F" in his one-month "Intugementary System" class. This was *the first class Plaintiff had ever failed*.

19.    In or about January 2011, NYCOM notified Plaintiff that he would meet with the Student Progress Committee, run by Associate Dean Mary Ann Achtziger, on January 18, 2011.

5

20.    NYCOM Classes resumed on January 3, 2011.  Plaintiff appeared before the committee as scheduled. Plaintiff was dressed in scrubs for class.  When he arrived, one committee member studied his clothing:  "Do you own a suit?  Maybe you should have worn one to this meeting."

21.    On January 18, 2011, the committee discussed Plaintiff's poor performance in the one class he did not pass.

22.    In accordance with NYCOM's official policy, Page 24 of the 2010-11 NYCOM Student Handbook, "F. GRADING POLICIES" Part I, Remediation Policy states:  "Students who have earned an unsatisfactory final grade in a ["Lecture-Discussion Based"/LDB] pre-clinical course (or part of the year. (Students Nervous System and Behavior course) or clerkship may be approved to remediate that LDB preclinical course or clerkship at the end of the academic on academic probation are not eligible to remediate.) Students, who have earned an unsatisfactory final grade in a ["Doctor Patient Curriculum"/DPC] Clinical Science course (a preclinical course), may be approved to remediate that DPC Clinical Science course at the end of the academic year. Only one pre-clinical course, DPC Clinical Science course, or clerkship may be remediated per student, per academic year. In such case, the student will be placed on Academic Warning status."

23.    Page 29 of the 2010-11 Student Handbook states: "When a student earns an Unsatisfactory (U) final grade in any one course of study or clerkship, that student will automatically be placed on **Academic Warning** until that course or clerkship has been passed. The student must contact the Learning Specialist regarding his/her Academic Warning Status within one week of being placed on academic warning to establish an individualized enrichment program. Failure to meet with the Learning Specialist or to comply with the terms of the enrichment program may result in dismissal. All Pre-Clinical students on Academic Warning Status will be scheduled for a meeting during the year with the Student Progress Committee who will review the student's progress and advise the Dean on the appropriate next step including: continuation/promotion; approval to take COMLEX; remediation; repeating the year or dismissal. The final decision will be made by the Dean. ... A grade of Unsatisfactory (U) will be recorded on the official transcript until the pre-clinical course or clerkship is successfully remediated, upon which the grade will be changed to Pass (P).  If unsuccessful in remediating the pre-clinical course or clerkship, the Unsatisfactory (U) will change to a grade of Failure (F), and the student will be subject to dismissal.  If a student earns an unsatisfactory final grade in a second pre-clinical course or clerkship in the same academic year, the student will receive a grade of Failure (F) in that pre-clinical course or clerkship and will be subject to dismissal from the College. In this case,

the original Unsatisfactory (U) grade from the first pre-clinical course or clerkship will be changed to a grade of Failure (F).

24.     In accordance with NYCOM's official policy (as referenced above), the committee instructed Plaintiff to repeat the failed class when the school year ended, over the summer of 2011."

**Hematology-Immunology: "F"**

25.     From about February 2011 through May 2011, Plaintiff continued to worry about his living situation.  Because he had signed a lease, he could not move out of the house he was sharing with his noisy roommates.

26.     Plaintiff tried harder to study.  He tried not to feel intimidated by his older, hostile roommates.

27.     As his first year came to a close, Plaintiff learned he had failed his two-month Hematology-Immunology class.

28.     In June 2011, Plaintiff appeared again before Dean Achtizger and the Student Progress Committee.

29.     Plaintiff tried to explain the problems caused by his roommates' conflicting nocturnal schedules and the personality clashes.  The hostile atmosphere affected his ability to concentrate.  To lend insight into his need for

peace and quiet, Plaintiff also disclosed, for the first time, that when he was eight

(8) years old, he was diagnosed with a mild case of Asperger's Syndrome.

30.    One website, describing personality traits of Asperger's children, says

some are gifted; "*sensitive to light and sound*; "question the status quo, resist

direction, have long attention spans, undergo periods of intense work and effort,

and like to organize things even as children," "have advanced vocabularies,

recognize patterns others do not, and pursue ideas despite evidence to the contrary

because they are not easily swayed by others' opinions," "focus on details," and

"spend long hours in laboratories and in front of computer screens because they do

not mind being alone".  They may have "*unusual reactions to stimuli such as*

*light and sound*," "They do not manipulate people but speak out frankly and

honestly. They are sincere truth-tellers, whose naivety and trusting nature makes

them incapable of backstabbing. As employees, *they are completely dependable*

*and follow the rules* of the job." [Emphasis added].  (Available at:

http://www.yourlittleprofessor.com/the-benefits-of-aspergers-syndrome/.).

## Student Progress Committee

31.    Under College policy, the Student Progress Committee might have

expelled Plaintiff because he had failed two classes in one year.

9

32.    Instead, in or about June 2011, they placed Plaintiff on Academic Probation.  He was ordered to repeat the one-month Integumentary System he had failed the previous Fall semester, and the Hematology-Immunology class he had failed during the Spring semester.

33.    In or about June 2011, Plaintiff was *also* ordered to repeat his Anatomy class (in which he got a 91%), his Intro class (in which he got an 86%), and *all* his other passed first-year classes.

34.    Plaintiff  was notified that he would be charged the full year's tuition ($47,510) for these repeated classes.

35.    However, this was not all Dean Achtziger wanted from Plaintiff.

**Unusual and Draconian Conditions**

36.     Plaintiff's continued enrollment, in or about August 2011,  included *additional, unusual, unwarranted, and draconian* conditions:

(1) Plaintiff was required to see a psychiatrist for an "evaluation."

(2) The committee selected the psychiatrist NYCOM wanted Plaintiff to see: Dr. Sergei Belkin.

(3) The committee required Plaintiff to waive, in writing, *all* his *legal HIPAA rights* to confidentiality.  He would provide members of the

10

committee among others *unrestricted access* to *all* his medical records *including Dr. Belkin's psychiatric notes*.

(4) The mandatory waiver included Plaintiff's permission for NYCOM to hold confidential conversations about him with his psychiatrist, and any other medical professional whose participation in Plaintiff's medical care would otherwise have been protected as confidential.

37.    Defendant's agents and employees notified Plaintiff, in or about June 2011, that if he did not agree to all of these terms, he would be dismissed from NYCOM.

**Psychiatric visit**

38.    Under this threat, in or about June 2011, Plaintiff had no choice but to agree to the onerous and draconian terms and conditions of his continued enrollment imposed by Defendant.

39.    Plaintiff knew what was at stake for him: his opportunity to be a doctor and practice medicine as a vocation. That summer, when his Bayville lease ended, Plaintiff moved to in Greenvale, a quiet neighborhood down the street from the NYCOM campus. He attended regular weekly sessions with Dr. Belkin in Glen Cove for his "evaluation" and paid a $15 co-payment for each session.

Pursuant to Dr. Belkin's instructions, Plaintiff began to take the prescription medication Lexapro. According to the website RxList, side effects of "Lexapro" (the trademark name of the antidepressant *Escitalopram*) include "drowsiness, dizziness, insomnia, nausea, weight changes, and decreased sex drive." (Available at: http://www.rxlist.com/lexapro-side-effects-drug-center.htm). Plaintiff was determined to prove to NYCOM that he was an exceptional student who would make an exceptional physician.

40.     Plaintiff began to experience startling, severe, and nasty side effects of the Lexapro. Over the summer of 2011, he gained 40 pounds and lost the ability to ejaculate. Concerned, he mentioned these symptoms to Dr. Belkin. In response, inexplicably, Dr. Belkin increased Plaintiff's Lexapro dosage.

41.     As the summer of 2011, wore on, Plaintiff grew unhappy with the unusual and draconian conditions he had agreed to with NYCOM. He now lived in a quiet apartment. The weekly appointments in Glen Cove were inconvenient, and they seemed rushed and unproductive. Although Plaintiff was punctual, he could be kept waiting as long as an hour in Dr. Belkin's office for his session. Plaintiff truly believed his new home offered everything he needed to study effectively and restore his life-long record of academic excellence.

**Mental illness?**

42.    In or about August 2011, there were other things that bothered Plaintiff. No one had ever before suggested he needed psychiatric treatment. Plaintiff had *no* history of misconduct or mental illness. Plaintiff also knew that Lexapro is not a normally prescribed "treatment" for Asperger's Syndrome, which is believed to be a genetic condition rather than a mental illness.

43.    Still, from June 2011 through August 2011, Plaintiff continued through the summer his sessions with Dr. Belkin and took the Lexapro—as mandated.

44.    In August 2011, Plaintiff reflected on his situation. He had complied entirely with the NYCOM committee's requirement, submitting to an "evaluation" with Dr. Belkin. He had taken the Lexapro all summer, including the increased dosage, in spite of the uncomfortable and extreme side effects. Plaintiff registered for the Fall 2011 semester classes, paid the tuition and required fees and re-took his entire first year of classes. Then he stopped going to the weekly sessions with Dr. Belkin, and he stopped taking Lexapro.

**Disciplinary Hearing**

45.    In August 2011, Plaintiff began to feel much better. He was optimistic about the year ahead.

13

46.    In August 2011, when Plaintiff cancelled his weekly appointments, Dr. Belkin reported his decision to Dean Achtziger.

47.    In September 2011, Plaintiff received an email which summoned him to appear on Thursday, October 6, 2011, before the Student Disciplinary Committee, which is also run by Dean Achtziger.   The email informed Plaintiff that he faced disciplinary action because he had failed to attend the mandatory medical student "White Coat Ceremony" that was held on August 5, 2011.

48.    On Monday, October 3, 2011, as Plaintiff finished the last of three examinations he had that day, a Proctor told him to report "immediately" to NYCOM Dean Thomas Scandalis's office for a meeting with the Student Disciplinary Committee.  Plaintiff headed straight to the conference room.

49.    On October 3, 2011, Dean Achtziger stated that in August, Plaintiff had been absent from the *mandatory* White Coat Ceremony for second year students.  She chastised Plaintiff for neglecting to attend this function.

50.    Plaintiff was surprised.  There was *no such mandatory ceremony* for Plaintiff's class that year.  In fact, Plaintiff's White Coat Ceremony was still two years away.  He was a first year student.  The committee, and Dean Achtziger, had made a mistake.

51.    But Dean Achtziger was not done.  She declared that Plaintiff had missed another function that was also held in August 2011 for first year students: the mandatory Orientation, which Plaintiff was required to attend because he was repeating his entire first year.

52.    Dean Achtziger was again wrong.  Plaintiff *had* attended the August 2011 Orientation.  And he could prove it: He had signed the attendance sheet.

53.    Plaintiff did not have a copy of the attendance sheet.  But he had a witness, who, luckily, was there in the room:  Dean Thomas Scandalis, seated at the conference room table.  Plaintiff reminded Dean Scandalis about their conversation during Orientation.

54.    Dean Scandalis recalled his talk with Plaintiff that day in August, 2011.  He confirmed that Plaintiff had attended Orientation.  Dean Achtziger was wrong about this charge, too.  The committee agreed that Plaintiff was innocent of missing this mandatory function.

55.    Dean Achtziger did not apologize.  Instead, she raised a third bogus charge: She now claimed that Plaintiff had "lunged" at her secretary.

56.    Plaintiff was shocked, surprised and dismayed to hear this.  He had only been in Dean Achtziger's office to set up his appointment with the committee. When he asked her secretary about scheduling, she had ordered him to wait for

them to call him and then threatened to call Security to have him thrown out of the office.  Plaintiff denied lunging at the secretary.  He thought this accusation was bizarre and offensive.  Plaintiff, in fact, did not "lunge" at Dean Achtziger's secretary—and did not engage in any conduct which could remotely be perceived as threatening or violent.

57.    Dean Achtziger still had additional complaints about Plaintiff. Bewildered and by now emotionally distraught from what appeared to be a totally unfounded, Kafkaesque campaign against him, Plaintiff continued to deny the rest of Dean Achtziger's charges.

58.    The most serious matter Dean Achtizger now raised, however, was Plaintiff's decision to end his sessions with Dr. Belkin and stop taking the Lexapro.

59.    Plaintiff explained to the committee that he had complied completely with their requirements.  He had spent his entire summer undergoing an evaluation by Dr. Belkin.  He described the terrible side effects of the medication prescribed by Dr. Belkin.  He explained his reasons for halting the weekly psychiatric sessions.  Plaintiff noted that the unnecessary weekly commutes to Glen Cove were time-consuming and disruptive.  He feared that if they continued, they would interfere with his medical studies.  Plaintiff was under enormous academic pressure given his precarious academic situation.

16

60.    In or about October 2011, Dean Scandalis responded to Plaintiff: "You can't decide for yourself what medication you should take.  You have to do what the committee wants you to do."  Dean Scandalis added that Plaintiff's personal decision to discontinue these treatments "shows you don't know how to do what you're told."  Dean Achtizger warned Plaintiff that these treatments with Dr. Belkin and the prescribed Lexapro were *not optional*.

**Censured**

61.    A few days later, still in October 2011, Plaintiff received a letter from NYCOM, signed by Dean Scandalis, stating that Plaintiff was being formally censured for "Failure to Comply" with the conditions set out by NYCOM.  The letter ended warning Plaintiff to resume his appointments "immediately" with Dr. Belkin and comply with all Dr. Belkin's treatment decisions.

62.    In October 2011, Plaintiff then resumed his visits to Dr. Belkin and took the Lexapro as ordered.  But on in about October 2011, he asked Dr. Belkin to reconsider the medication and the weekly psychiatric sessions.   Dr. Belkin urged Plaintiff to continue with his treatment sessions.

63.    Plaintiff, in or about November 2011, asked Dean Scandalis for permission to be evaluated by a different psychiatrist.  Dean Scandalis denied this request.  He told Plaintiff that because Dr. Belkin had provided NYCOM this

17

specific recommendation about Plaintiff, only Dr. Belkin was authorized to make changes in this treatment plan. Dean Scandalis warned Plaintiff that his objections cast doubt on Plaintiff's ability to practice medicine. He said that Plaintiff was showing them that he was inclined to *disobey* instructions of an attending physician by not accepting, unconditionally, NYCOM's orders and Dr. Belkin's judgment with respect to his medical treatment. Dean Scandalis also told Plaintiff that if Dr. Belkin said that Plaintiff no longer needed therapy, then the school would accept his decision.

**Classes, Treatments**

64.    In 2011, Plaintiff continued to pass his classes. To ensure that

65.    A few weeks later, in or about November 2011, Plaintiff again asked Dr. Belkin whether, in his professional opinion, he still believed these psychiatric sessions were necessary. Dr. Belkin responded they were important.

66.    However, in December 2011, Dr. Belkin suddenly advised Plaintiff that he no longer needed psychiatric treatment or Lexapro. Instead, he was recommending that Plaintiff schedule sessions with a therapist. Dr. Belkin was not a therapist.

**Psychologists**

67.    In December 2011, Plaintiff returned to Dean Scandalis and confirmed his advice that Plaintiff could end his sessions with Dr. Belkin and stop taking the Lexapro.  Plaintiff signed another waiver giving NYCOM access to his medical records and commenced sessions with the therapist referred by Dr. Belkin, Glen Cove psychologist Mary Rose Q. Paster, PhD.

68.    In December 2011, Plaintiff still did not believe he needed to be in therapy.  But he was relieved that he had permission to stop taking the Lexapro. During his first session with Dr. Paster, Plaintiff began to wonder if she believed that Plaintiff might have a serious mental disorder.  Based on Dr. Paster's questions and comments during his second session, he realized that Dr. Paster was receiving third party advice.  He considered the possibility that Dean Achtziger was providing misinformation to her about him.

**Twisted facts**

69.    By December 2011, Plaintiff no longer trusted Dean Achtziger.  He worried that she was twisting facts and providing misinformation to Dr. Paster about Plaintiff.  He thought Dean Achtizger had been embarrassed in front of her own committee when she falsely accused Plaintiff, in front of her committee and Dean Scandalis, of being absent from two mandatory NYCOM functions.  Plaintiff

19

now believed Dr. Paster was drawing conclusions based on conversations she was holding with Dean Achtziger.

70.    In or about December 2011, Dr. Paster admitted to Plaintiff she was confused as to what Dean Achtizger was requesting her to do regarding the professional treatment of the Plaintiff.

71.    In an attempt to fully comprehend and confirm Dean Achtziger's request, Dr. Paster sent an email to Dean Achtziger confirming the required treatment as well as confirming a list of allegations against the Plaintiff set forth by Dean Achtziger.

72.    In or about December 2011, Dr. Paster revealed that Dean Achtziger had reported falsely and maliciously, among other things, that Plaintiff had "lunged" at a faculty member and needed "therapy" because he was a "serious discipline problem." *Plaintiff has no history of misconduct, violence or abuse.*

73.    After three appointments with Dr. Paster in December 2011, Plaintiff returned to Dr. Belkin and asked him to discontinue these therapy treatments. Dr. Belkin instead referred Plaintiff to a psychologist in Oyster Bay, Deborah Ross. In January 2012, Plaintiff began to attend regular sessions with Deborah Ross. Plaintiff signed another HIPAA privacy waiver and gave it to NYCOM.

74.     Plaintiff still feared that Dean Achtziger might be seeking an excuse to expel him from NYCOM. He wondered whether she might try to convince a medical professional that Plaintiff was unfit to be a doctor.

75.     A time later, in or about January 2012, a NYCOM administrator ("Joan Gothardt") contacted Plaintiff again. Plaintiff was now accused of changing therapists without authorization. Dr. Belkin had apparently not informed NYCOM that Plaintiff would be switching therapists, with his approval. Ms. Gothardt threatened Plaintiff with expulsion from the medical school if he did not follow completely Dr. Belkin's exact treatment plan. Ms. Gothardt told Plaintiff that he would not be compliant with NYCOM's mandate if he saw Debra Ross. Plaintiff scrambled to locate Dr. Belkin, who was out of town, and procured the psychiatrist's official consent for his sessions with Dr. Ross.

76.     Shortly after Plaintiff discovered the communication between Dean Achtziger's office and Debra Ross, he asked to speak with Dean Achtziger in hopes to alleviate his concerns regarding her comments to Debra Ross.

77.     During this conversation between Plaintiff and Dean Achtziger in or about January 2012, Dean Achtziger told Plaintiff that the committee knew about his objections to treatment with Dr. Belkin, which NYCOM *required,* and to taking Lexapro. Dean Achtziger lectured Plaintiff about his attitude and his criticism of

NYCOM.  She said the committee was especially concerned about Plaintiff's decision to see Debra Ross, without the required recommendation from Dr. Belkin.

78.     Dean Achtziger was wrong again.  Nevertheless, although Dr. Belkin had directed Plaintiff to see Debra Ross as a replacement for Dr. Paster, Plaintiff was threatened again with expulsion for his failure to continue treatment with Dean Achtziger's chosen therapist as well as for Plaintiff's comments to Dr. Belkin that he did not think he required psychiatric treatment, therapy or drugs, a message which Dr. Belkin told Plaintiff he had himself conveyed to NYCOM.

79.     Because Plaintiff had been referred by Dr. Belkin for therapy with Debra Ross, in January 2012, Plaintiff continued his sessions.  Debra Ross told Plaintiff, in or about January 2012, that Dean Achtziger had been contacting her office with comments about him.  Much to Plaintiff's relief, Debra Ross told Plaintiff she did not believe Dean Achtziger's comments were valid.

80.     During this discussion Dean Achtziger denied she had personally contacted Debra Ross's office, when in actuality Dean Achtziger's secretary was communicating with Debra Ross vicariously through Dean Achtziger, at the Dean's direction.

81.     In June 2012, after his classes ended, Plaintiff again asked Dr. Belkin if he *still* thought he needed therapy.  Dr. Belkin replied, "If you had a patient who

presented with no problems in my office, but then you talked to his boss and he told you he'd gone to work and killed 3 people, then what should I think?"

82.      Dr. Belkin's response to this question was discouraging and distressing to Plaintiff.  Plaintiff had passed *all* his classes and complied with *all* of NYCOM's demands.  Upon information and belief, Dean Achtziger had deliberately misled and deceived Dr. Belkin about Plaintiff by stating or suggesting to him that he had a propensity to engage in threatening or violent behavior.  How else to explain Dr. Belkin's comments about a hypothetical patient who "killed three people?"

83.      Dean Scandalis at this time in or about June 2012, had been removed as NYCOM Dean.  Dr. Barbara Ross-Lee, the VP of Health Sciences at New York Institute of Technology, was interim NYCOM Dean.  Plaintiff decided to write a letter to Dr. Ross-Lee describing his concerns.  Plaintiff said he did not need medical treatment and believed Dean Achtziger was supplying false information about him to Dr. Belkin and the two therapists.

84.      After receiving Plaintiff's letter, in or about June 2012, Dr. Ross-Lee met with Plaintiff.  She said she would recommend that NYCOM "review our procedures for disclosing information."  Plaintiff also asked Dr. Ross-Lee.

86.    Plaintiff continued with his summer therapy sessions (in June 2012), with Dr. Ross. But in July, a few weeks later, Dr. Belkin called Plaintiff with some news: He had decided that Plaintiff did not need therapy. When Plaintiff speculated that Dean Scandalis and Dean Achtziger might not agree to this new recommendation, Dr. Belkin replied that Plaintiff was only required to attend therapy sessions if *Dr. Belkin* said this was necessary. He told Plaintiff he would write a letter to NYCOM and inform them that in his professional opinion Plaintiff *did not need medication* and was *done with therapy*. Dr. Belkin also said that he had already discussed this decision with Dean Achtziger. He said she was "on board with it."

87.    At this point, Plaintiff contacted Assistant Dean Felicia Bruno Plaintiff and Dean Bruno, via an email, about Dr. Belkin's change in treatment recommendation. Plaintiff told her, in words or substance, that "I want to make sure I'm compliant with everything the school is asking for" before taking any action.

88.    On or about July 20, 2012, Dr. Ross-Lee scheduled another meeting with Plaintiff. She told Plaintiff that she had received Dr. Belkin's letter and would forward it to the Student Progress Committee. She said that Dr. Belkin had actually told NYCOM in this letter that Plaintiff was "resisting" therapy. Upon information and belief, this was a completely false and malicious characterization

24

of Dr. Belkin's letter and position regarding Plaintiff's status and conduct.  Dr. Ross-Lee then told Plaintiff:  "We'll let the Student Progress Committee decide what that means."

89.    On or about July 23, 2012, Plaintiff again went to appear before the Student Progress Committee.

90.    After waiting another three hours to be called, Plaintiff was summoned into the conference room at 1:00 p.m. before Dean Bruno, Dean Achtziger, Associate Dean Ronald Portanova and other committee members.

91.    Plaintiff thought the meeting started well.  Plaintiff was proud of his academic performance and described for the committee a successful year.

92.    "But we have this letter," someone said, holding up the letter from Dr. Belkin.

93.    The committee explained their position to Plaintiff:  Either you "accept this help that's in front of you for this condition that you have, or [you will] be expelled."

94.    Plaintiff could tell from the tone of the committee member that they were unimpressed with his academic performance.  Plaintiff replied:  "I will do whatever you want me to do."

95.    At this, Dr. Portanova exploded.  He called Plaintiff a "problem."  He yelled at Plaintiff for raising questions about the medication and for objecting to psychiatric treatment and therapy.  Plaintiff apologized.  He tried to calm Dr. Portanova down.  He promised to cooperate, as he had done for the past year.  Dr. Portanova continued to yell.  The meeting ended.

96.    The following Monday, Plaintiff received a letter from Dr. Ross-Lee dated July 23, 2012, informing him that he was dismissed from NYCOM.

97.    Plaintiff was stunned and emotionally distraught.  He had done everything he had been told to do, including repeating his entire first year and passing all his classes, taking unnecessary medication, enduring strong and unpleasant side effects, and attending regular sessions with a psychiatrist and later with two therapists for *one year*.

98.    In or about July 2012, Plaintiff opened his NYCOM Facebook page and posted a comment expressing his disappointment.  He wondered why NYCOM had put him through this, or why they thought he needed psychiatric treatment or medication.  He wrote: "Dr. Belkin thought I was fine.  I am surprised."

99.    In or about July 2012, Plaintiff called Dr. Belkin for guidance.  The Glen Cove psychiatrist talked to Plaintiff and said he was shocked to hear that NYCOM had dismissed Plaintiff.  He told Plaintiff that he would write NYCOM

*another letter* to clarify his opinion that Plaintiff needed no treatment, no medication and was fit to resume his studies as a medical student. Dr. Belkin, however, did not show Plaintiff a copy of the first letter he had written to NYCOM.

100.    Plaintiff returned to the NYCOM campus in or about late July 2012, and sought help from Dr. Barbara Ross-Lee, desperate to understand what had gone wrong and address the personal attacks (and apparent falsehoods) against him by Dean Achtziger that led to his dismissal. Dr. Ross-Lee agreed to meet with Plaintiff in her office.

101.    In or about August 2012, Plaintiff brought his then—fiancée and his mother to the meeting. Dr. Ross-Lee brought Dean Achtziger and Dean Bruno with her. Dr. Ross-Lee was livid about Plaintiff's Facebook comment in which he stated that Dr. Belkin had told Plaintiff he did not think Plaintiff needed treatment. Dr. Ross-Lee appeared to believe that Plaintiff's Facebook account was not true.

102.    At this meeting, Plaintiff explained that he had turned to Facebook for help. He did not criticize NYCOM or Dean Achtziger or Dr. Ross-Lee. He used no profanity. He was not angry. He was confused and distraught. He was merely sought answers to these reasonable questions. He needed someone to explain what had happened and how he could resolve it.

103.   Plaintiff's mother, herself confused, agreed with her son that NYCOM's decision to expel Plaintiff came as a complete shock and surprise. She asked Dr. Ross-Lee to explain what Plaintiff had done to be expelled. Dr. Ross-Lee merely smirked as Plaintiff's mother poured out her heart. Dean Achtziger also smirked when Plaintiff's mother told her how much Plaintiff wanted to continue as a student at NYCOM.

104.   When Plaintiff's mother asked what Plaintiff could possibly have done wrong to be dismissed, Dean Achtziger had the unmitigated gall to make fun of her: "I see where he gets it from," she said.

105.   Plaintiff's fiancée (now wife), moreover, pleaded with Dr. Ross-Lee for mercy and asked if Plaintiff could see a different psychologist. Dr. Ross-Lee responded with nothing but a sardonic smile.

106.   Dr. Ross-Lee turned to Plaintiff.

107.   "You showed poor judgment," she said. "You manipulated Dr. Belkin into writing this letter."

108.   Dr. Ross-Lee told Plaintiff that she "would consider" Plaintiff's reinstatement as a NYCOM student after one year, provided he obtain "treatment" and show that his "judgment" was "improved."

109.   Plaintiff interpreted Dr. Ross-Lee's concern about his "judgment" and her objections to his Facebook posts as a warning that he was expected to keep this entire episode confidential and not mention it on Facebook or anywhere else ever again.

110.   For now, said Dr. Ross-Lee, it was clear to her that Plaintiff was trying to *"game the system"* and was not going to stop challenging NYCOM's terms for his enrollment.  "When we tell you to do something, we mean it!" she said.  *"You are DIS-MISSED!"*

111.   Hoping to convince Dr. Ross-Lee how seriously he took her new conditions about "judgment" and "treatment," in or about August 2012, Plaintiff sought treatment from a psychologist back home in Massachusetts, Richard Halgin, PhD.  After his sessions began, Plaintiff contacted Dean Bruno to tell her about his therapy sessions.  Dean Bruno replied that Plaintiff should not contact her again before February 2013.  Plaintiff continued with his sessions with Dr. Halgin.  After several visits, Dr. Halgin wrote a letter to Dean Bruno with a positive evaluation of Plaintiff, recommending that NYCOM readmit Plaintiff.  Dean Bruno emailed Plaintiff:  This was "not what we asked for."

111.    What they asked for, Dean Bruno said (in or about February 2013), was that Plaintiff needed to be treated by a *different* psychiatrist, Dr. Victor Fornari.

112.    In or about March 2013, Plaintiff then began psychiatric treatment with Dr. Fornari.  He moved back to Long Island for these appointments with Dr. Fornari.

113.    At the time NYCOM sent Plaintiff for sessions with Dr. Fonari (in 2013, after his dismissal from NYCOM), Plaintiff's wife was emotionally distressed, distraught and terrified. She was afraid that because NYCOM was pushing the idea that Plaintiff was mentally ill, and had apparently rejected the evaluation of his chosen psychologist (Dr. Richard Halgin), NYCOM may have chosen Dr. Fornari in an attempt to have Plaintiff committed to a psychiatric care facility against his will.

114.    These sessions with Dr. Fornari were held at Zucker Hillside Hospital, which is an in-patient and out-patient psychiatric hospital, with the facilities and legal authority to commit and hold patients involuntarily.

115.    This all contributed to Plaintiff's wife's fear and concerns.  She conveyed these fears and concerns to Plaintiff, which enhanced and exacerbated

his emotional distress. Plaintiff, at this point, was in an extraordinarily fragile and vulnerable emotional state. He was extraordinarily vulnerable to manipulation.

116.    Plaintiff still intended to continue his training in medicine. In or about September 2013, he sought advice from a faculty member at another medical school. He described his experience at NYCOM. The faculty member told Plaintiff that there was *no* chance he would be accepted by *any* medical school with NYCOM's dismissal on his record.

117.    In or about August 2013, Plaintiff went to other graduate school interviews. He was asked to explain why he had not finished NYCOM. His transcript showed he had either dropped out or flunked out. Plaintiff had no way of proving his incredible story about being forced to submit to psychiatric treatment and coerced into taking medication for a non-existent psychiatric condition.

118.    In the Fall of 2012, Plaintiff began to face the depressing and deflating possibility that he might have to give up medicine as a career. With his strong record in science disciplines, and his high MCAT performance, Plaintiff applied to approximately seven doctoral programs in the fall of 2012 and the winter of 2013:

• University of Massachusetts Medical School - Biomedical Sciences

- University of Massachusetts at Amherst, his alma mater –

  - Molecular/Cellular Biology

  - Neurology

- University of Connecticut's Biomedical Science program.

- SUNY Stony Brook

  - Molecular Biology

  - Cellular Biology

- SUNY Albany:

  - Biology

  - Biomedical Sciences.

119.  As part of his applications, Plaintiff was required to disclose to these universities his dismissal from NYCOM.  Most of his applications were rejected immediately, without an interview.   Plaintiff was accepted to the SUNY Albany PhD program in Biology, but that program was cancelled due to lack of funding.

120.  In the Summer of 2013, Dr. Ross-Lee agreed to meet with Plaintiff one last time.  At this meeting, held in or about June or July 2013, she confirmed what Plaintiff had expected:  NYCOM would never permit him to resume the study of medicine there.

121.   Dr. Ross-Lee had other tips for Plaintiff.  She loudly told him that he was "welcome to sue" NYCOM.  She informed him that *other* dismissed students have done this.  "We've only had to take back three students in the *history of the college!"* she told him.  *"Three students...* and *none* of them made it!  You want to sue?" she said.  "Go ahead!"

122.   Plaintiff told Dr. Ross-Lee at that meeting that he had no plans to sue NYCOM.  He could not afford a lawyer.  He described his difficult financial situation, his two years of medical student loans.  He and his new wife had a small income.  They had no health insurance.  They lived with her parents.  Plaintiff was $73,000 in debt to SallieMae for his NYCOM tuition.

123.   "So," said Dr. Ross-Lee, "you need money."

124.   In or about June or July 2013, Dr. Ross-Lee made a proposal for Plaintiff.  She suggested that Plaintiff request, in writing, a refund of his tuition.

125.   Upon information and belief, Dr. Ross-Lee and/or other NYCOM officials, fully aware that NYCOM had defrauded and otherwise grossly mistreated Plaintiff and thus were vulnerable to substantial potential damages for such fraud and mistreatment, initiated a scenario designed to induce Plaintiff—unable to obtain counsel, financially destitute, and in a state of emotional distress, to "release" his valuable claims against NYCOM for mere nuisance value.

126.    Plaintiff sent his refund request to NYCOM a few days later, in or
about June or July 2013.  NYCOM's General Counsel, Catherine Flickinger,
replied with a legal agreement to refund him $30,000, subject to various
conditions:  Plaintiff promised (1) not to apply again for reinstatement as a
NYCOM student, (2) to release and forever discharge all claims arising from his
enrollment and dismissal, (3) not to "disparage" NYIT, NYCOM or any of its
faculty or employees, and (4) never to disclose these terms to any other party other
than his own legal counsel.

127.    NYCOM's counsel at this time was Catherine Flickinger, Esq., a 1977
graduate of Columbia Law School who spent seven years as an associate at
Cravath Swaine & Moore, several more years as General Counsel of the Columbia
Broadcasting System, and the rest of her career as a Vice President at Hachette
Publications.  Ms. Flickinger is a highly skilled and experienced attorney.

128.    NYCOM commanded an overwhelmingly powerful advantage over
Plaintiff Regnier, wielding not only legal expertise but first-hand, intimate
knowledge of Plaintiff's Asperger's Syndrome diagnosis as well as access to
Plaintiff's privileged sessions with Dr. Belkin, two therapists, and his entire
medical file.  NYCOM's complete and unfettered access to Plaintiff's medical
records permitted its officials agents and employees to know, in specific detail, that

Plaintiff was in a state of extreme distress, emotional turmoil, and mental anguish as a result of his ordeal with NYCOM.

129.   Paragraph 5 of the Release agreement (which was drafted entirely by NYCOM, tendered by NYCOM to Plaintiff, and eventually executed by Plaintiff and NYCOM) stated:

> Upon your request, NYITCOM will provide
> documentation, in accordance with NYITCOM
> policies, in connection with any application to
> continue your education at another institution.

130.   In or about June or July 2013, Plaintiff signed the Release agreement and returned it to NYCOM.  Plaintiff was known to them to have been diagnosed with Asperger's Syndrome.  Plaintiff had *no* legitimate opportunity to negotiate the terms of this agreement or have the terms reviewed by his own legal counsel.  A check for $30,000 arrived in the mail a few days later.

131.   Plaintiff had expected a "tuition refund" for *all* his tuition.  But the offer he received—in or about June or July 2013, was much smaller.  Facing a desperate financial situation, he had no opportunity to have the terms negotiated or reviewed by an attorney.

132.   Plaintiff realized that there was nothing he could do to convince anyone at NYCOM that they were wrong to dismiss him.  No one at this college cared.

133.   In or about August 2013, Plaintiff reflected on what Dr. Scandalis and Dr. Ross-Lee had said about his 'treatment."  Both had told Plaintiff they were only following Dr. Belkin's recommendation.  Both had told Plaintiff that if Dr. Belkin decided Plaintiff did not need treatment, Plaintiff did not need treatment.  Yet, when Dr. Belkin concluded Plaintiff was fine, NYCOM sent him to Dr. Fornari.

134.   In or about August 2013, Plaintiff next asked NYCOM, pursuant to their written promise (in the Release agreement), to confirm their conditions of enrollment and explain why he had been dismissed.  He wanted other colleges to be aware that he had done well academically but had medical treatment forced on him, and was dismissed for objecting to that treatment.

135.   But NYCOM refused to comply with this request (which it had expressly agreed to—in writing—and upon which Plaintiff had relied and otherwise would *not* have executed the Release).

136.   In a letter dated September 3, 2013, Catherine Flickinger told Plaintiff that NYCOM would *not* provide Plaintiff the documentation he needed, a

confirmation as to the truth about his two and one-half years as a NYCOM student

and the terms of his enrollment and eventual dismissal. Oddly, she ended her letter

with the words: "NYITCOM intends to comply in full with the June 13, 2013

Settlement Agreement." This refusal to provide documentation of Plaintiff's

attendance at NYCOM was an act of non-compliance with NYCOM's promise to

"provide documentation, in accordance with NYITCOM policies, in connection

with any application to continue your education at another institution."

137. Catherine Flickinger wrote: "In light of the final disposition

represented by the Settlement Agreement, I am not going to address the various

factual statements of your email, most of which we disagree with, and I would

suggest that you refrain from rehashing the history of your time at NYITCOM. I

strongly remind you of your agreement in the Settlement Agreement not to

disparage NYITCOM or its personnel."

138. On September 27, 2013, Plaintiff requested an appointment at

NYCOM to review his "education record", as defined by FERPA. NYCOM has a

policy of allowing students to examine parts of their education record that have

been pre-approved by its legal counsel. Plaintiff was allowed access to what was

presented by NYCOM as his education record on December 12, 2013. Pursuant to

NYCOM's policy, he was not allowed to photocopy his file or allow anyone to

accompany him to inspect its contents. Plaintiff discovered the record was

incomplete. It omitted, for instance, Dr. Belkin's letter to NYCOM which stated—according to NYCOM officials—that Plaintiff was "resisting" medical care and treatment. The file also was missing documentation of "infractions" referenced by Dean Achtziger, in violation of FERPA.

139.   Plaintiff read his NYCOM admissions notes in his file describing him as a "strong candidate." Plaintiff asked NYCOM to retrieve the missing documents.

140.   In January 2014, Plaintiff returned to review the missing contents. Plaintiff has still not seen his entire education record.

141.   General Counsel Catherine Flickinger's letter to Plaintiff referencing "problems with authority" were likewise not documented in Plaintiff's education record.

142.   Plaintiff needed photocopies of these important documents to show other colleges why he had been dismissed. Plaintiff maintains this is conduct in direct violation of the terms of his agreement with NYCOM, and contrary to the oral promises of NYIT Vice President Dr. Ross-Lee and current NYCOM dean Dr. Wolfgang Gilliar. Both had promised to support Plaintiff's applications to other colleges if he were to sign NYCOM's agreement (which had been drafted by NYCOM's counsel).

143.  On June 17, 2014, Plaintiff's newly hired counsel, Kevin T. Mulhearn, P.C., sent a letter to Catherine Flickinger, Esq., NYCOM's General Counsel, which requested an opportunity to review Plaintiff's educational records pursuant to the Family Educational Rights and Privacy Act.  To date, however, neither NYCOM nor Ms. Flickinger has responded to that request.

**COUNT ONE**

**THE RELEASE SHOULD BE DECLARED NULL AND VOID**

144.  Plaintiff hereby repeats and realleges paragraphs 1-144 herein, as of each has been fully set forth at length.

*Unconscionability*

145.  The Release executed by Plaintiff was obtained by Defendant under circumstances, taken in their entirety, which indicate unfairness, overreaching and unconscionability.

146.  The Release at issue was grossly unreasonable and unconscionable in light of the mores and business practices of the time and place as executed and, as such, should be deemed unenforceable according to its literal terms.

147.  The facts and circumstances involved in the execution of said Release demonstrate that Plaintiff was deprived of a meaningful choice in the matter, the Release was initiated by Defendant's agents and employees' knowledge of their

own wrongful and/or fraudulent acts towards Plaintiff (and their desire to conceal and escape culpability from their own wrongdoing, the Release was drafted entirely and exclusively by NYCOM's counsel, Plaintiff was unable to—and did not—hire an attorney to review the terms of the Release, there was a gross disparity in experience and bargaining power between Plaintiff and Defendant, (particularly Defendant's counsel), and deception, false statements, and high-pressure tactics, were employed by Defendant's agents, employees, officials, and administrators to induce Plaintiff to execute the Release.

148.   Plaintiff, at all times suffered from Asperger's Syndrome, lacked experience and expertise in legal and business matters at the time he executed the Release, suffered severe emotional distress as a result—in large part—of his abrupt and unwarranted dismissal from NYCOM, and the myriad falsehoods, omissions, distortions, and otherwise wrongful and/or fraudulent acts of Defendant's agents, employees, officials, and /or administrators, and did not fully understand the terms of the Release or its implications, ramifications, or consequences.

149.   At all material times, Plaintiff was confronted with a lack of meaningful choice, resulting in gross inequality in bargaining power with respect to the Release.

150.    The terms of the Release, in view of the entirety of the circumstances of this case, unreasonably favored Defendants.

*Fraud*

151.    The Release at issue, moreover, was induced by fraud.

152.    As stated herein, Defendant through its agents and/or employees, Dr. Barbara Ross-Lee and Dr. Wolfgang Gilliar, made a material misrepresentation or omission of fact, by representing to Plaintiff, in writing and orally, while the three met in Dr. Ross-Lee's office in or about June 2013, that "upon [his] request, NYITCOM [would] provide documentation, in accordance with NYITCOM policies, in connection with any application [by Plaintiff] to continue his education at another institution."

153.    Plaintiff specifically advised Dr. Barbara Ross-Lee and Dr. Wolfgang Gilliar, while meeting with both NYCOM officials in Dr. Ross-Lee's office in or about June 2013, that this provision was of critical importance to him because he intended to notify other institutions of higher learning that he had done well academically at NYCOM, but was dismissed from medical school for objecting to medical treatment that was made a mandatory condition of his continued enrollment at NYCOM.

41

154.   Plaintiff specifically advised Dr. Barbara Ross-Lee and Dr. Wolfgang Gilliar, while meeting with both NYCOM officials in Dr. Ross-Lee's office in or about June, 2013, that he would not agree to the settlement and release unless NYCOM agreed to provide that clarification, in writing, to other graduate schools which Plaintiff was interested in attending.

155.   Dr. Barbara Ross-Lee, specifically told Plaintiff, in or about June, 2013, that NYCOM policies permitted said documentation to be tendered, that NYCOM agreed to that condition, and NYCOM memorialized that agreement (as stated in paragraph 5, *supra)* in the Release drafted by Catherine Flickinger, Esq., NYCOM's General Counsel.

156.   Defendant, therefore, made material misrepresentations of fact—that NYCOM policies expressly permitted the school to provide Plaintiff with documentation of the specific reasons for his termination from the medical school.

157.   Dr. Barbara Ross-Lee also made material misrepresentations of fact when she told Plaintiff, shortly after dismissing him from medical school in or about August 2012, while in Dr. Barbara Ross-Lee's office, that Dr. Belkin claimed that Plaintiff was "resisting" necessary medical care and treatment when, in fact, upon information and belief, Dr. Belkin's letter made no such claim—but NYCOM agents, employees, officials, and administrators (including Dr. Ross-Lee)

nevertheless deliberately and maliciously mischaracterized to Plaintiff the contents and tone and tenor of Dr. Belkin's letter in an effort to provide Plaintiff with a bogus pretext as to why NYCOM had dismissed Plaintiff from medical school.

158.   All of the above material misrepresentations by Defendants were false and made by Defendants with knowledge of their falsity, with the knowledge that Plaintiff would rely on the truth of those representations, and thus with the intent to defraud Plaintiff.

159.   At all material times, Plaintiff relied on the aforesaid material misrepresentations and, in fact, would not have executed the settlement agreement and Release had those representations not been made.

160.   Said material misrepresentations, and the aforesaid acts and omissions of Defendant, caused harm and damages to Plaintiff, in that, *inter alia*: he expended considerable sums on his medical education, which was unfairly and unconscionably derailed by Defendant; he suffered extreme emotional distress and pain and suffering; his educational opportunities at a graduate school other than NYCOM were severely limited and/or foreclosed due to Defendant's failure to provide the requisite explanatory documentations of Plaintiff's unique "dismissal" circumstances; and the damages caused by Defendant far exceeded the sum which he was paid pursuant to the settlement agreement and Release.

*Breach of Contract/Unclean Hands*

161.   The settlement agreement at Release provides expressly that Plaintiff's release of Defendants was conditioned upon NYCOM providing Plaintiff, at his request, with documentation of the circumstances of his enrollment and eventual dismissal from the NYCOM medical school program.

162.   Plaintiff has expressly requested that NYCOM provide him with the above-referenced documentation, but has been told—by Catherine Flickinger, NYCOM's General Counsel—that NYCOM would *not* provide Plaintiff with the requested documentation.

163.   Defendant, therefore, has breached the express terms of the Settlement Agreement and Release, without good cause or justification, and thus may not, as a matter of law and/or equity, compel Plaintiff to be bound to the terms of the agreement when Defendant itself is in blatant and obvious non-compliance with their core obligations under the agreement.  Defendant has "unclean hands" and may not now avail itself of legal and/or equitable relief.

*Duress*

164.   Defendant induced Plaintiff to execute the Release by means of lies, falsehoods, distortions, and wrongful threats—which, *inter alia,* wrongly suggested to members of the medical community that Plaintiff had engaged in

44

threatening and/or violent behavior—which precluded Plaintiff's exercise of his free will, under the press of financial circumstances, as the exorbitant costs of Plaintiff's medical education left him in dire financial circumstances and in significant debt with very little money in-pocket at the time of the Release, and these circumstances provided Plaintiff with no reasonable alternative but to execute the settlement and Release and receive the grossly and patently inadequate partial tuition refund offered by Defendants.

165.   At all material times, moreover, Defendant knew that Plaintiff was in dire financial straits and that—because of Defendants' acts and omissions—Defendant was in fact liable for a sum exponentially higher than the modest sum provided by Defendant to Plaintiff pursuant to the Settlement Agreement and Release.

## COUNT TWO

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 "(ADA")

166.   Plaintiff repeats and realleges paragraph 1 through 166 herein, as if each has been fully set forth at length.

167.   The Americans with Disabilities Act notes that individuals with disabilities encounter discrimination which includes "exclusionary standards and criteria", and "relegation to lesser services, programs, (and) activities" (42 U.S.C.

§12101(a), parenthesis added). The Act's purpose is to reflect "a clear and compelling national mandate for the elimination of discrimination against individuals with disabilities." (42 U.S.C. §12101(b)).

168.    The ADA, 42 U.S.C. §12112(a)), provides in pertinent part that covered defendants may not discriminate against a party on the basis of his disability or perceived disability.  The ADA, provides further that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation" 42 U.S.C. §12182 (a).

169.    Upon information and belief, Defendant NYCOM is subject to the provisions of the ADA. Defendant is a place of public accommodation—i.e., a place of education—which must therefore comply with the terms and provisions of Title III of the ADA (42 U.S.C. §12181(7) (J)).

170.    Plaintiff—who has been diagnosed with Asperger's Syndrome—has disabilities, recognized as such under the Statute. That is, Plaintiff has physical or mental impairments which substantially interfere with major life activities, among them, speaking, learning, reading, concentration, thinking, communicating, and

working (42 U.S.C. §12102 (1)(A) and (2)), and, as such, is entitled to reasonable accommodations and equal opportunities in both an educational and employment context.

171.   At all material times, NYCOM had notice of Plaintiff's disability but denied Plaintiff the opportunity to participate in or benefit from its programs, and, by mandating that he obtain unneeded and unwarranted psychiatric care and treatment, including forcing him to ingest powerful drugs which severely interfered with and harmed his basic functioning and quality of life, discriminated against Plaintiff in violation of the ADA.

172.   NYCOM had no cause or justification to run roughshod over Plaintiff's right to privacy, and right to control his own body, by conditioning his continued medical education on compliance with medical directives (including forcing him to take powerful, unnecessary medication) for a non-psychiatric condition from a psychiatrist.

173.   NYCOM's denial of fair access to its programs, its blatant discrimination against Plaintiff, and its wrongful dismissal of Plaintiff based on pretextual and illegitimate reasons, is discriminatory, and thus violates both the letter and spirit of the ADA.

174.    Wherefore Plaintiff suffered substantial damages as a direct and proximate result of Defendant's conduct, and requests relief as set forth below.

## COUNT THREE

## VIOLATION OF THE REHABILITATION ACT Of 1973, SECTION 504(a)

175.    Plaintiff repeats and realleges paragraph 1 through 175 herein, as if each has been fully set forth at length.

176.    Section 504(a) of the Rehabilitation Act of 1973 (29 U.S.C. § 701,*et seq.*) provides in pertinent part that:

> No otherwise qualified individual with a disability … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

177.    Section 504(a) of the Rehabilitation Act of 1973 thus prohibits any program receiving federal financial assistance from discriminating against a qualified individual with a disability solely by reason of or on the basis of his disability.

178.    Upon information and belief, Defendant NYCOM is a recipient of federal funds—i.e., financial assistance within the contemplation of the Statute, and thus subject to the provisions of the Rehabilitation Act.

179.   Plaintiff is a qualified individual as defined by the Rehabilitation Act, with disabilities recognized thereunder, and, as such, is entitled to reasonable accommodations, program accessibility, and equal opportunities in  an educational context.

180.   Plaintiff is a qualified individual as defined by the Rehabilitation Act. That is, with or without reasonable accommodation, Plaintiff has the ability to perform the essential functions, program, and activities of a medical student and physician, the very functions, program, and activities administered by Defendant.

181.   At all material times, Defendant, NYCOM, had notice of Plaintiff's disability (Asperger's Syndrome) but unfairly denied Plaintiff the opportunity to participate in or benefit from its programs, and activities.

182.   Defendants Defendant NYCOM could easily have provided fair access to its programs, to Plaintiff without requiring significant difficulty, expense, or undue hardship.

183.   Defendant's failure or refusal to provide Plaintiff with fair access to its programs is discriminatory, and thus violates both the letter and spirit of the Rehabilitation Act.

184.   Wherefore Plaintiff suffered substantial damages as a direct and proximate result of Defendant's conduct, and requests relief as set forth below.

49

## COUNT FOUR

## HOSTILE EDUCATIONAL ENVIRONMENT

185.   Plaintiff repeats and reiterates paragraphs 1 through 185 as if fully set forth herein.

186.   Following a successful academic career at University of Massachusetts at Amherst, Plaintiff applied for and was granted admission to NYCOM.

187.   Like any other enrolled student, Plaintiff had a right to expect that NYCOM would honor its obligation to provide him with a quality medical education, provide him with a supportive and collegial learning environment, make appropriate and reasonable allowances  and accommodations for any disability and do nothing to interfere with Plaintiff's legitimate  pursuit of his educational aspirations.

188.   On the contrary, Defendant NYCOM engaged in an ongoing pattern of harassing, abusive, coercive, dishonest, and threatening behavior towards Plaintiff.  Defendant's conduct materially impacted Plaintiff's educational experience, exacerbated his learning issues, and anxiety disorders and destroyed his confidence.  Said harassment had the effect of denying to Plaintiff any of

NYCOM's accommodations, advantages, facilities, or privileges to which Plaintiff was rightfully entitled.

189.   Defendant NYCOM, by its ongoing behavior, significantly damaged Plaintiff, and many others known to Plaintiff, by creating a hostile educational environment that was pervasive. Defendant knew or should have known of the harassment and hostile educational environment, and failed or refused to take action reasonably calculated to end same, and failed or refused to implement effective preventive and remedial means to curb said tortious conduct.

190.   Wherefore Plaintiff requests relief as set forth below.

## COUNT FIVE

### UNJUST ENRICHMENT

191.   Plaintiff hereby repeats and realleges paragraphs 1 through 191 herein, as if each has been fully set forth at length.

192.   During his studies at NYCOM, Plaintiff provided NYCOM with substantial sums as and for tuition and school-related expenses in consideration for and in expectation of the provision of a course of studies leading to matriculation and a degree as Doctor of Osteopathic Medicine.

193.    Defendant NYCOM contributed to, and helped create a hostile educational environment, and was in violation of anti-discrimination laws, respecting the Plaintiff, an individual with qualified disabilities. Further, Defendant deprived Plaintiff of the opportunity to receive his degree of Doctor of Osteopathic Medicine.

194.    Defendant NYCOM was allowed to profit at Plaintiff's expense, as it unfairly and unjustly received from the Plaintiff substantial sums in tuition, related fees, and other benefits without making any restitution to Plaintiff therefore. As a result of NYCOM's unjust acts of enrichment, Plaintiff has suffered, and continues to suffer, losses and damages in a sum to be proved at trial.

195.    It would be against equity and good conscience to permit Defendant NYCOM to retain, and be unjustly enriched by any of the tuition fees, and other benefits that it received from Plaintiff during the course of Plaintiff's studies at NYCOM.

196.    Wherefore Plaintiff requests relief as set forth below.

## COUNT SIX

## MONEY HAD AND RECEIVED

197.    Plaintiff repeats and realleges paragraphs 1 through 197 herein, as if each has been fully set forth at length.

198.   Defendant, NYCOM, received money belonging to Plaintiff, in the form of tuition payments and various and sundry school-related fees and expenses.

199.   Defendant, NYCOM, benefited from the receipt of that money.

200.   Under principles of equity and good conscience, the Defendant should not be permitted to keep any of that money.

201.   Wherefore Plaintiff suffered substantial damages as a direct and proximate result of Defendant's conduct, and requests relief as set forth below.

## COUNT SEVEN

## BREACH OF CONTRACT

202.   Plaintiff hereby repeats and realleges paragraphs 1 through 202 herein, as of each has been fully set forth at length.

203.   The Plaintiff was enrolled at NYCOM.  He was student in good standing.  His tuition was paid.  There is no question that he complied with all the terms of the Student Code of Conduct.

204.   There was an "implied contract" between NYCOM and its enrolled students, in that if Plaintiff were to perform his required duties and comply with his educational responsibilities, NYCOM would confer upon him a medical degree.

205.   NYCOM, and its agents and employees, at all times, knew that the Plaintiff was enrolled at NYCOM.

206.   NYCOM intentionally interfered with the Plaintiff's implied contract pursuant to its aforesaid conduct.

207.   NYCOM, and its agents and employees, intentionally and without good cause and justification, breached its contractual promises to Plaintiff, in violation of its procedures, as specified in the NYCOM Student Handbook to which Plaintiff, at all times, complied.

208.   The actions of Defendant NYCOM evidenced a callous, intentionally malicious, reckless, wanton and deliberate indifference to Plaintiff's contractual right to his enrollment at NYCOM, his graduation therefrom, and his pursuance of a license to practice medicine. Defendant breached its contract with Plaintiff, proximately causing Plaintiff to sustain substantial damages.

209.   Wherefore Plaintiff requests relief as set forth below.

## COUNT EIGHT

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

210.   Plaintiff repeats and realleges paragraph 1 through 210 herein, as if each has been fully set forth at length.

211.   Defendant NYCOM knew or reasonably should have known that its conduct towards Plaintiff would and did proximately result in physical and emotional distress.

212.   Defendant NYCOM breached the duty it owed to Plaintiff to provide an environment free from unfair treatment, discrimination and retaliation. At all relevant times, Defendant NYCOM had the power, ability, authority and duty to stop engaging in the conduct described above and/or to intervene to prevent or prohibit said conduct.

213.   Despite its knowledge, power and duty, Defendant NYCOM negligently failed to act to stop engaging in the conduct described herein, and/or to prevent or prohibit such conduct, or otherwise protect Plaintiff. To the extent that such negligent conduct was perpetrated by its faculty, staff, and administration, Defendant NYCOM ratified said conduct with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and with wanton and reckless disregard for the deleterious consequences to Plaintiff therefrom.

55

214.  As a direct and proximate cause and result of Defendant NYCOM conduct, Plaintiff has suffered and continues to suffer serious emotional distress, humiliation, anguish, emotional and physical injuries, as well as economic losses.

215.  Wherefore Plaintiff requests relief as set forth below.

## COUNT NINE

## NEGLIGENT MISREPRESENTATION

216.  Plaintiff repeats and realleges paragraph 1 through 216 herein, as if each has been fully set forth at length.

217.  In the course of its business, NYCOM, through its agents, administrators, officials, and faculty, made misrepresentations and omissions of material facts to Plaintiff with knowledge that such statements were false, and/or negligent and/or reckless disregard of the truth and/or falsity of those statements, and with the intention that Plaintiff rely on said statements.

218.  Defendant NYCOM-NYIT failed to take reasonable care in obtaining and communicating to Plaintiff material information about its actual authority to resolve disability-related and/or disability issues, the treatment recommendations of Dr. Belkin, and NYCOM's reasons, if any, for dismissing Plaintiff from medical school.

219.   Plaintiff reasonably and detrimentally relied on Defendant NYCOM's misrepresentations and omissions, and submitted to Defendant's demeaning and unwarranted mandate to obtain medical care and treatment that he did not need—which caused him to suffer—and which he should not have been required to endure.

220.   Defendant NYCOM's negligent misrepresentations and omissions caused, and will continue to cause, irreparable injury to Plaintiff for which there is no adequate remedy at law.

221.   Plaintiff's injury is a direct consequence and was proximately caused by Defendant NYCOM's false assertions and representations.

222.   Wherefore Plaintiff requests relief as set forth below.

## COUNT TEN

### DECEPTIVE PRACTICES IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE ACTS AND PRACTICES)

223.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 223 herein, as if each said allegation has been set forth at length.

224.   New York General Business Law ("GBL") § 349 prohibits deceptive and misleading business practices and its scope is broad.

225.   GBL § 349 on its face applies to virtually all economic activity.

226.   GBL § 349 applies to educational services and/or goods provided to educational consumers by private medical schools like NYCOM-NYIT.

227.   GBL § 349 thus encompasses a significantly wider range of deceptive business practices that were never previously condemned by decisional law. Indeed, GBL § 349 was intended to be broadly applicable, extending far beyond the reach of common law fraud.

228.   At all material times, the Plaintiff was a consumer of educational services.

229.   At all material times, NYCOM engaged in a broad-based marketing scheme, which was designed to induce students to enroll in, and complete their medical school studies at NYCOM.

230.   At all material times, as stated above and otherwise, from 2010 to the present, NYCOM made material misrepresentations to Plaintiff in various press releases, press statements, brochures, newspaper advertisements, magazine advertisements, and correspondence, and the Student Handbook, which stated or

suggested, expressly or implicitly, that he would earn his medical degree and obtain a medical license if he were to comply with his obligations as a medical student and pass all his medical board examinations, and that NYCOM would use its best efforts to help Plaintiff earn his medical degree and pass his medical board examinations.

231.   At all material times, NYCOM knew that the above representations were false in that it had no intention to provide Plaintiff with reasonable assistance in passing his medical board examinations and permitting him to earn a medical degree and medical license, and did not provide such assistance, even though Plaintiff complied with all of his obligations as a medical student, and in fact, even though Plaintiff complied with numerous absurd, deleterious, and draconian conditions—unfairly imposed upon him by Defendant and its administrators, agents and/or officials.

232.   Each of the aforesaid misrepresentations was likely to mislead and deceive a reasonable consumer acting reasonably under the circumstances.

233.   In determining what types of conduct may be deceptive practices under New York law, New York courts should apply an objective standard which asks whether the representation or omission was likely to mislead a reasonable consumer acting reasonably under the circumstances, taking into account not only

the impact on the average consumer, but also on the vast multitude which the statutes were enacted to safeguard – including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.

234.    Here, NYCOM, and its agents and employees, took great pains, at great expense, to make sure that appearances and general impressions, buttressed by a bombardment of positive representations, would lead a reasonably educated consumer into thinking that NYCOM would use its best efforts to help Plaintiff pass his medical board examinations and earn a medical degree.

235.    Most savvy educational consumers, not just the ignorant, unthinking, and credulous, would never have imagined that NYCOM, despite its glowing and positive appearances and general impressions, would have permitted one of their students to endure an educational experience that was consisted of threats, lies, draconian conditions, and general hostility towards Plaintiff and a constant attack of his character.

236.    NYCOM thus engaged in "deceitful conduct" in violation of GBL § 349.

237.    Moreover, as a result of NYCOM's violation of GBL § 349, Plaintiff is entitled to receive treble damages for his compensatory damages (such as

reimbursement of tuition and other educational costs and expenses), to the extent and in the amount applicable, as well as reasonable attorneys' fees, pursuant to GBL § 349 (h), and/or other authority.

238.   Wherefore Plaintiff requests relief as delineated above, and as set forth below.

## COUNT ELEVEN

## VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
## NEW YORK EXECUTIVE LAW § 296

239.   Plaintiff repeats and realleges paragraphs 1 through 239 herein, as if each has been fully set forth at length.

240.   New York Executive Law § 296 provides that:

a)   It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, including the extension of credit, or, directly or indirectly, to publish,

circulate, issue, display, post or mail any written or printed

communication, notice or advertisement, to the effect that any of the

accommodations, advantages, facilities and privileges of any such

place shall be refused, withheld from or denied to any person on

account of race, creed, color, national origin, sexual orientation,

military status, sex, or disability or marital status, or that the

patronage or custom threat of any person of or purporting to be of

any particular race, creed, color, national origin, sexual orientation,

military status, sex or marital status, or having a disability is

unwelcome, objectionable or not acceptable, desired or solicited.

b)   Nothing in this subdivision shall be construed to prevent the barring

of any person, because of the sex of such person, from places of

public accommodation, resort or amusement if the division grants an

exemption based on bona fide consideration of public policy; nor

shall this subdivision apply to the rental of rooms in a housing

accommodation which restricts such rental to individuals of one sex.

c)   For the purposes of paragraph (a) of this subdivision,

"discriminatory practice" includes:

i)   a refusal to make reasonable modifications in policies,

practices, or procedures, when such modifications are

62

necessary to afford facilities, privileges, advantages or
accommodations to individuals with disabilities,
unless such person can demonstrate that making such
modifications would fundamentally alter the nature of
such facilities, privileges, advantages or
accommodations.

ii) a refusal to take such steps as may be necessary to
ensure that no individual with a disability is excluded
or denied services because of the absence of auxiliary
aids and services, unless such person can demonstrate
that taking such steps would fundamentally alter the
nature of the facility, privilege, advantage or
accommodation being offered or would result in an
undue burden;

iii) a refusal to remove architectural barriers, and
communication barriers that are structural in nature, in
existing facilities, and transportation barriers in
existing vehicles and rail passenger cars used by an
establishment for transporting individuals (not
including barriers that can only be removed through

the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable.

241.    At all material times, Plaintiff suffered from a "disability" as defined by this statute.

242.    At all material times, for the aforesaid reasons, Defendant NYCOM took affirmative steps to exclude or deny services to Plaintiff, and exclude or deny him from NYCOM's medical school program, and exclude or deny him the opportunity to become a physician and practice medicine, exclusively because of, and in response to, Plaintiff's disability.

243.    As a direct and proximate result of Defendant's violations of New York Executive Law § 296, Plaintiff suffered, and continues to suffer, substantial harm and damages.

## COUNT ONE

## FRAUD

244.    Plaintiff repeats and realleges paragraphs 1 through 243 herein, as if each has been fully set forth at length.

245.    At all material times, Plaintiff had a property interest in the full value of his claims and/or potential claims against the Defendants in this case.

246.  For the reasons stated herein (*see, e.g.,* paras. 151-160, *supra,* and otherwise).  Defendant NYCOM, through its agents, employees, administrators, and officials, made false representations to Plaintiff to induce the Plaintiff to compromise his claims against Defendant NYCOM, and Plaintiff, relying thereon, was induced to compromise and release his claims against Defendant NYCOM for but a small fraction of their true value.

247.  The compromise sum received by Plaintiff ($30,000.00) for his claims against NYCOM was not the fair value of those claims, and would not have been accepted and affirmed by Plaintiff had Defendant's agents, employees, administrators, and officials told Plaintiff the truth that they knew and believed as to the matters for which representations were made to Plaintiff.

248.  Plaintiff would not have executed the Release, and would not have accepted the Release monies ($30,000.00) if he had known, or been told, the truth of the matters represented to him by Defendants agents, employees, administrators and officials.

249.  Plaintiff, in fact, is entitled to have the release agreement with NYCOM be made as good for him as it reasonably and fairly would have been if the truth had been told instead of falsehoods asserted.

250.   Plaintiff, therefore, is entitled to receive as damages from Defendant NYCOM the difference between the amount he actually received ($30,000.00) and the air and reasonable settlement value of his claims against NYCOM of his claims against NYCOM at the time he executed the Release agreement.

251.   The acts and omissions of Defendant's agents, employees, administrators, and officials, as alleged herein were willfully wanton, and malicious, lacking any redeeming social value, had a direct and negative effect on the public-at-large, as well as Plaintiff, evince a high degree of moral turpitude and demonstrate such wanton dishonesty as to imply a criminal indifference to their civil obligations, and demonstrate heedlessness and an utter disregard for the rights and wellbeing of Plaintiff.

252.   As such, Defendants conduct as alleged herein gives rise to punitive damages.

* * *

253.   Wherefore Plaintiff requests relief as set forth below.

WHEREFORE, based on the aforesaid, Plaintiff respectfully requests that this Court issue an Order and Judgment against Defendant, and in favor of Plaintiff, as follows:

(1) As and for Count One: A Declaratory Judgment declaring the Release executed by Plaintiff to be null and void and unenforceable;

(2) As and for Count Two:  Violation of ADA, compensatory damages in a sum to be determined at trial;

(3) As and Count Three: Violation of the Rehabilitation Act of 1973, section 504(a), compensatory damages in a sum to be determined at trial;

(4) As and for Count Four: Hostile Educational Environment, compensatory damages in a sum to be determined at trial;

(5) As and for Count Five: Unjust Enrichment, compensatory damages in a sum to be determined at trial;

(6) As and for Count Six: Money Had and Received, compensatory damages in a sum to be determined at trial;

(7) As and for Count Seven: Breach of Contract, compensatory damages in a sum to be determined at trial;

(8) As and for a Count Eight Negligent Infliction of Emotional Distress, compensatory damages in a sum to be determined at trial;

(9) As and for Count Nine: Negligent Misrepresentation, compensatory damages in a sum to be determined at trial;

(10) As and for Count Ten: Deceptive Practices in Violation of New York General Business Law § 349 (Deceptive Acts and Practices), compensatory damages, treble damages, and attorneys' fees, in a sum to be determined at trial;

(11) As and for Count Eleven: Violation of New York Executive Law § 296, compensatory damages in a sum to be determined at trial;

(12) As and for Court Twelve: Fraud, compensatory damages and punitive damages in a sum to be determined at trial.

(13) The costs and disbursements of this action;

(14) All attorneys' fees and expenses incurred in the prosecution of this action; and

(15) Any other, further, or different relief in favor of Plaintiff to which this Court may seem just, proper or necessary.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.


Dated:          September 22, 2014             Respectfully submitted:
                Orangeburg, New York
                                               KEVIN T. MULHEARN, P.C.



                                               _____
                                               By:  Kevin T. Mulhearn (KM2301)
                                               60 Dutch Hill Road
                                               Suite 15
                                               Orangeburg, New York 10962
                                               Phone No.: (845) 398-0361
                                               Email: kmulhearn@ktmlaw.net

                                               *Attorneys for Plaintiff,* Todd Regnier

70

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                    INDEX NO.:

TODD REGNIER,

                        Plaintiff,

        - against -

NEW YORK COLLEGE OF OSTEOPATHIC MEDICINE
OF NEW YORK INSTITUTE OF TECHNOLOGY
("NYCOM-NYIT" or "NYCOM"),

                        Defendant.

## COMPLAINT

KEVIN T. MULHEARN, P.C.
Attorneys for Plaintiff
Office Address & Tel. No.:
60 Dutch Hill Road, Suite 1B
Orangeburg, New York 10962
(845) 398-0361
kmulhearn@kbmlaw.net

*Pursuant to 22 NYCRR §130-1.1 the undersigned, an attorney admitted to practice in the courts of New York State, certifies that upon information and belief the matters set forth in the annexed document are not frivolous.*

Dated:  September 22, 2014          Signature: _____
                                   Print Signer's Name:   KEVIN THOMAS MULHEARN